IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PORFIRIO PINEDA-MARIN,        )
MARGARITO CAMACHO-OLIVA,       )
CATALINO MORGA-COLON, and      )
FELIPE ROJO-GARCIA,            )
                              )    No.  CV-08-798-HU
            Plaintiffs,        )
                              )
      v.                       )
                              )
CLASSIC PAINTING INC. d/b/a    )
PRO CLASSIC COATINGS, an       )
Oregon corporation; GEOFFREY   )
EDMONDS, individually; PRO     )    FINDINGS OF FACT &
KOTE INC., an Oregon corpor-   )    CONCLUSIONS OF LAW
ation; PRO KOTE LLC, an Oregon)
limited liability company;     )
SHERWIN THINGVOLD, individ-    )
ually; and SHELDON THINGVOLD,  )
individually,                  )
                              )
            Defendants.        )
_____)

D. Michael Dale
LAW OFFICE OF D. MICHAEL DALE
P.O. Box 1032
Cornelius, Oregon 97113

/ / /

/ / /

1 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Meg Heaton
NORTHWEST WORKERS' JUSTICE PROJECT
917 S.W. Oak Street, Suite 426
Portland, Oregon 97205-2837

        Attorneys for Plaintiffs

J. Gary McClain
J. GARY McCLAIN, P.C.
11073 S.E. Main Street
Milwaukie, Oregon 97222

        Attorney for Defendants Pro Kote, Inc., Pro Kote LLC,
        Sherwin Thingvold, and Sheldon Thingvold

HUBEL, Magistrate Judge:

        Plaintiffs bring this wage-related action against defendants, contending that defendants failed to pay them overtime wages and minimum wages, in violation of federal and state statutes. They also bring a separate Oregon statutory claim for failure to pay wages upon termination, and a breach of contract claim, both based on the same conduct as the overtime and minimum wage claims.

        All parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c). I conducted a court trial on February 9 and 10, 2010. Before trial, plaintiffs and defendants Classic Painting and Geoffrey Edmonds stipulated to the entry of judgment against those defendants. Thus, Classic Painting and Edmonds made no appearance at the trial. The following are my Findings of Fact and Conclusions of Law. Fed. R. Civ. P. 52(a).

                          FINDINGS OF FACT

        All four plaintiffs are painters. All speak Spanish and so little, if any, English, they testified through an interpreter who also translated the proceedings from English to Spanish for plaintiffs. Before 2005, plaintiffs were all employed by Pro Kote,

2 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Inc., which became Pro Kote, LLC.   Both of these entities were painting companies owned and operated by the Thingvolds.

Sometime in early 2005, the Thingvolds decided they no longer wanted to own their own business.   Thus, in the spring of 2005, they entered into an "arrangement" with Edmonds and Classic Painting, Edmonds's company.   The nature of that arrangement is disputed, with the Thingvolds contending that they and plaintiffs became employees of Classic Painting, and plaintiffs contending that the Thingvolds were joint employers with Edmonds and Classic Painting for purposes of the wage statutes.

I.   Transition from Pro Kote to Classic Painting

Morga-Colon, Camacho-Oliva, and Rojo-Garcia started working for Pro Kote in July or August 2003.   Pineda-Marin did not testify when he started working for Pro Kote.   Rather, he responded in the affirmative to counsel's question that he was employed continuously from June 2005 through February 2008.   The obvious issue in this case is "who" employed plaintiffs.   Notably, this question by counsel did not ask Pineda-Marin who employed him during this time.

None of the plaintiffs provided detailed information about the transition from being employees of Pro Kote to being employees of Classic Painting.   Morga-Colon indicated that he knew of the change because his pay checks were different.   While working for Pro Kote, his paychecks did not show the name Pro Kote.   He testified that beginning in October 2005, however, his check stubs had the name of Classic Painting or Pro-Classic Painting.   Exhibit 2 reveals that pay stubs bearing Morga-Colon's name, beginning in October 2005 and continuing to October 2006, bore the name "Classic Painting • dba Pro-Classic Coatings."   Exh. 2 at pp. 6-12.   The same exhibit shows

3 - FINDINGS OF FACT & CONCLUSIONS OF LAW

that Morga-Colon's pay stubs beginning in October 2006 and
continuing to December 2007, bear the name "Classic Painting" only.
Id. at pp. 12-23.  There are other pay stubs prior to October 2005
that reveal no employer name. Id. at pp. 1-5.  Check stubs for the
other three plaintiffs are similar. Exh. 1 (pay stubs for Camacho-
Oliva), Exh. 3 (pay stubs for Pineda-Marin)[1], Exh. 4 (pay stubs for
Rojo-Garcia).[2]

Morga-Colon earned $12 per hour at Pro Kote and continued to
earn $12 per hour at Classic Painting.  He later received a raise
while working at Classic Painting.  Morga-Colon stated that the
Thingvolds made the decision about the raise.

Camacho-Oliva indicated that he learned about the change in
employment when "they," presumably referring to the Thingvolds,
said they were going to be associated with Edmonds.  He could not
remember the date.  He noted that Sherwin Thingvold brought "us" a
new application.  He further explained that at that time, Sherwin
Thingvold told him that everything, including his wages, was going

---

[1]  During his testimony, Pineda-Marin noted that the March
2005 and April 2005 pay stubs on page 14 of Exhibit 3, both of
which reveal no employer name, came from Pro Kote but, he added,
"you could say that they come from Pro Classic because they don't
even have a name."

[2]  At the beginning and end of the relevant time period,
Edmonds's company used the name Classic Painting, and for some
period of time in the interim, used the name Classic Painting,
dba Pro Classic Coatings.  According to undisputed testimony by
the Thingvolds, Edmonds added part of the Pro Kote name to the
Classic Painting name for a period of time to appeal to former
Pro Kote contractors.
   During the trial, witnesses referred to Edmonds's company in
a variety of ways, including the name "Pro Classic."  For
simplicity, I use Classic Painting to refer to Edmonds's company,
regardless of the time period at issue.

4 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1    to remain the same.  His pay rate of $12 per hour at Pro Kote
2    remained the same at Classic Painting.  A few months "after they
3    united with Pro Classic," his pay went to $13 per hour.  No one
4    spoke to him about the raise.

5        Rojo-Garcia testified that he began working for Pro Kote in
6    August 2003 and he first learned of Geoffrey Edmonds when Edmonds
7    "got together" with the Thingvolds.  He stated that he worked for
8    Edmonds's company.  He gave no date and no other information about
9    the transition other than to say that he earned $10 per hour while
10   at Pro Kote and continued to earn $10 per hour from Classic
11   Painting.

12       Pineda-Marin also worked for Pro Kote and then worked at
13   Classic Painting.  Other than that, he gave no testimony about how
14   he learned of the transition.  He earned $13 per hour when he
15   worked for Pro Kote and continued to earn $13 per hour when he
16   started at Classic Painting.  Later, he received a raise to $15 per
17   hour.

18       Sherwin Thingvold testified to the history of his company, its
19   change from Pro Kote, Inc., to Pro Kote, LLC, and the fact that Pro
20   Kote, LLC no longer exists.  None of this testimony is disputed.
21   He described how he and his brother tired of running their own
22   company, including the headaches of dealing with employees and
23   contractors.  He noted that owning a company meant putting in twice
24   the time and getting paid half as much.

25       He testified that the Thingvolds quit working with Pro Kote,
26   LLC at the end of the first quarter of 2005.  Although this would
27   put the time at the end of March 2005, Pro Kote's check register
28   indicates that the time was possibly mid-April 2005.  Exhibit 503

5 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1  is a copy of Pro Kote's check register.  After a check written on
2  April 18, 2005, a line appears across the register with an arrow
3  and a note that says "Pro Classic."  Exh. 503 at p. 7.  The next
4  entry below that line is a check written on May 18, 2005.  Id.
5  Sherwin Thingvold testified that he drew the line to separate the
6  time from when "we were Pro Kote to the time we started working for
7  Geoff Edmonds and Classic Painting."

8      Before the transition, plaintiffs were Pro Kote employees.
9  The Thingvolds knew Edmonds as a "friendly" competitor.  When the
10 Thingvolds ended their business, they became employees of Classic
11 Painting.  The Thingvolds were paid a salary, with Sherwin earning
12 $2,000 per month for about thirty hours of work per week, and
13 Sheldon earning $3,000 per month, and later, $4,000 per month.
14 Sherwin Thingvold explained that at the time, Pro Kote, Inc. owed
15 some back taxes and he was attempting to work out an offer and
16 compromise with the Internal Revenue Service.  Thus, he was
17 interested in keeping his wages down, and because his wife made "a
18 lot of money," he took only $2,000 per month in salary.

19      According to Sherwin Thingvold, Edmonds hired Pro-Kote's
20 employees because Classic Painting took on new jobs with
21 contractors who were previously Pro Kote's clients.  Sheldon
22 Thingvold recommended that Edmonds hire plaintiffs.  Sheldon
23 Thingvold stated that Edmonds just "picked up" plaintiffs' wages.

24      Sherwin Thingvold testified that in April and May 2005, the
25 Thingvolds told plaintiffs that the Thingvolds were no longer their
26 employer.  They had meetings and asked the employees, including
27 plaintiffs, to bring two pieces of identification for Edmonds to
28 use in filling out certain forms.  Sherwin Thingvold explained that

6 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1  the Thingvolds told the employees that they were going to try and
2  make the transition as smooth as possible with little change in the
3  day to day work.  According to the Thingvolds, they explained that
4  Edmonds was the sole owner and that plaintiffs were employees.  The
5  Thingvolds' statements were translated into Spanish for plaintiffs.

6       Gregory Bensberg testified that he began working for the
7  Thingvolds shortly before the transition to Classic Painting
8  occurred, in April 2005.  He attended a meeting with the Thingvolds
9  a couple of weeks after he started working for them.  At least
10 three of the plaintiffs, whom Bensberg identified as Camacho-Oliva,
11 Morga-Colon, and Pineda-Marin, were present.  The purpose of the
12 meeting, according to Bensberg, was for the Thingvolds to tell Pro
13 Kote employees that they would no longer be working for Pro Kote.
14 He indicated that because there were other job sites, some
15 employees were not present at this particular meeting.  According
16 to Bensberg, the Thingvolds repeated numerous times to plaintiffs
17 that the Thingvolds were no longer their employers.

18      While the actual date that Pro Kote, LLC ceased to be
19 plaintiffs' employer is a bit unclear, the evidence presented in
20 the trial indicates that it was sometime in the spring of 2005.[3]
21 I base this finding on the specificity of the Thingvolds' testimony
22 and their ability to recall the precise time at which they no
23 longer employed plaintiffs, as well as the documentary evidence of
24 Pro Kote's checkbook which supports the Thingvolds' testimony, and
25 Bensberg's testimony which also corroborates the Thingvolds'

26
27      [3] Agreed Facts in the Pretrial Order indicate that Morga-
    Colon, Camacho-Oliva, and Rojo-Garcia were employed by Pro Kote
28  through September 2, 2005.  I address this below.

7 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1    testimony.   In  contrast,  none  of  the  plaintiffs  pinpointed  a
2    particular date or month in which the transition occurred.

3        Although Morga-Colon disputed that he attended a June 2005
4    meeting in which the Thingvolds told him that they and Pro Kote
5    were no longer his employer, Camacho-Oliva mentioned filling out an
6    application and being told that everything was going to continue
7    the same.  This is consistent with the Thingvolds' testimony that
8    there were forms at these meetings and that they reassured Pro Kote
9    employees that things would remain much the same.  I find the
10   Thingvolds' and Bensberg's testimony on this issue more complete in
11   detail  than  plaintiffs'  testimony.   To  the  extent  plaintiffs'
12   testimony is inconsistent, I find the Thingvolds' and Bensberg's
13   testimony more credible.

14       Undisputed facts regarding the transition by the Thingvolds
15   from Pro Kote to Classic Painting are that the Thingvolds received
16   no ownership interest in Classic Painting either at the time of the
17   transition or any time thereafter, the Thingvolds were not
18   corporate officers of Classic Painting, the Thingvolds owned no
19   stock  in  Classic  Painting,  they  received  no  compensation  for
20   bringing business to Classic Painting, they had no check signing
21   authority for Classic Painting, they have never had any type of
22   joint banking account with Edmonds or Classic Painting, and they
23   have  never  owned  any  real  or  personal  property  with  Edmonds  or
24   Classic Painting.

25       Finally,  the  evidence  establishes  that  the  Thingvolds
26   determined plaintiffs' wages while plaintiffs were employees of Pro
27   Kote and that Edmonds continued paying plaintiffs those same wages
28   upon becoming their employer most likely at the recommendation of

8 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1   the Thingvolds.   The evidence does not show that the Thingvolds
2   affirmatively set the plaintiffs' hourly wages at the inception of
3   their  employment  with  Classic  Painting,  other  than  this
4   recommendation which the record supports was adopted by Edmonds as
5   his own decision.
6   II.  Employment at Classic Painting
7        Plaintiffs'  testimony  regarding  the  nature  of  the  work  and
8   supervision at Classic Painting was consistent.   They stated that
9   the Thingvolds assigned them to various projects and instructed
10  them where to report to work, that the Thingvolds determined who
11  received work and who did not when work was slow, that workers
12  continued to use some of the Thingvolds' equipment on jobs for
13  Classic Painting, that the Thingvolds supervised them at job sites,
14  that  they  reported  their  work  hours  to  the  Thingvolds,  that
15  problems with pay were brought to the attention of the Thingvolds,
16  and that Sherwin Thingvold hand-delivered their paychecks to them.

17       Pineda-Marin testified that some of his paychecks were signed
18  by Sherwin Thingvold and some were signed by Edmonds.  But, he was
19  unable to state when that change occurred.  Rojo-Garcia stated that
20  "at the beginning," the signature on his paychecks seemed to be
21  Sherwin Thingvold's.  At some point, he continued, it changed but
22  he did not indicate when.  Page 1 of Exhibit 4 is a check made out
23  to Rojo-Garcia, dated January 8, 2008, bearing the name Classic
24  Painting.  Exh. 4 at p. 1.  It is signed by Edmonds.  Id.

25       Morga-Colon could not recall who signed his paychecks during
26  the period June 2005 to January 2008.  Camacho-Oliva initially
27  testified that he did not know who signed the pay checks associated
28  with the pay stubs in Exhibit 1.  Then, he stated that it seemed to

9 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1   him that those appearing on pages 1 through 4 of the exhibit were

2   signed by Sherwin Thingvold.  However, he then conceded when asked

3   to look at page 3, containing pay stubs dated in June and July

4   2005, that he did not, in fact, know who signed the paychecks

5   associated with those pay stubs.

6       Plaintiffs conceded that employees other than the Thingvolds

7   sometimes supervised crews at particular job sites.  While some

8   were reluctant to label the position a "supervisor," they agreed on

9   something akin to "team leader."  Plaintiffs named several other

10   individuals who, at one time or another, or at one job site or

11   another, were supervisors or team leaders, including Luis Duran,

12   Gabriel Zabala, and plaintiff Pineda-Marin.  Morga-Colon indicated

13   that when these individuals were in charge of a group, they

14   supervised and directed him in regard to his work.  Camacho-Oliva

15   noted that he functioned as a crew leader or foreman on a couple of

16   jobs.  Pineda-Marin considered himself a team leader on certain

17   jobs and in that role, he instructed workers on how to do their

18   jobs.  Morga-Colon and Camacho-Oliva both testified that the

19   Thingvolds supervised the work of the various team leaders.

20       Plaintiffs did not dispute the Thingvolds' testimony that

21   neither Sherwin, nor Sheldon Thingvold believed he had the

22   authority to hire, fire, or discipline plaintiffs or other Classic

23   Painting employees.  The Thingvolds stated that Edmonds retained

24   authority over those matters.  There also appears to be no dispute

25   that neither Thingvold had any responsibility for maintaining

26   hourly work records for plaintiffs.

27       Although Morga-Colin indicated that the Thingvolds made the

28   decision to raise his hourly wage while he worked at Classic

10 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Painting, Camacho-Oliva and Pineda-Marin did not specifically state who was responsible for the raises they received after they went to work at Classic Painting.[4]  In contrast, the Thingvolds testified that Edmonds made the decision to issue pay raises to the three plaintiffs who received them.  Sherwin Thingvold noted that Edmonds may have asked him for his input or opinion, but the final decision belonged to Edmonds.  Sheldon Thingvold confirmed that he had no voice or decision-making authority in regard to the raises.

Sherwin Thingvold testified that when he began working for Classic Painting, he acted as a liaison between the contractors that had previously hired Pro Kote, and Edmonds, because the contractors knew the Thingvolds and trusted them.  Sherwin Thingvold described traveling to various job sites which were manned by different crews and communicating between the contractor and the supervisor at the job site regarding what needed to be done, what the schedule was, what materials needed to be ordered, and what equipment was needed.  Then, he would turn the job over to the on-site job supervisor.  Such supervisors included Duran, Camacho-Oliva on a couple of occasions, and Zabala.  Sherwin

---

[4]  In response to various questions by counsel, Pineda-Marin testified that his wage while working at Pro Kote was $13 per hour, that he started at Classic Painting at $13 per hour, and that he later received a raise to $15 per hour while working at Classic Painting.  In response to another question by counsel inquiring who decided how much Pineda-Marin would be paid, Pineda-Marin simply responded that Sherwin Thingvold made that decision.  Because counsel neglected to pinpoint the time period at issue for this question, it is not clear from Pineda-Marin's testimony if he meant that Sherwin Thingvold made pay rate decisions while Pineda-Marin was a Pro Kote employee, a Classic Painting employee, or while an employee of either company.  This failure to tie the testimony to a particular time period was a frequent problem during the trial.

1  Thingvold also noted that Edmonds already had, as part of his own
2  original crew, his son Geoff Junior, and two other employees as on-
3  site job supervisors.

4      Sherwin Thingvold stated that for the first several months of
5  his employment with Classic Painting, he collected employee hours
6  from the on-site job supervisors.  He tired of this practice,
7  however, because the hours were in Spanish and it took time to sort
8  it out.  At some point, Sherwin Thingvold and Edmonds decided that
9  all employees should turn their hours into Duran who translated all
10  of it from Spanish into English.  Sheldon Thingvold did not collect
11  work hours for his crew and stated that his crew had to turn over
12  their work hours to either Sherwin Thingvold or Duran.  Pineda-
13  Marin testified that he had turned his work hours into Duran on
14  occasion.

15      The Thingvolds explained that some of their equipment, such as
16  pumps, sprayers, and ladders, was used after they became employees
17  of Classic Painting.  Sherwin Thingvold stated that because of the
18  influx of new employees to Classic Painting, Edmonds did not have
19  enough equipment of his own initially, so they used some of the
20  Thingvolds' equipment.  Additionally, Sherwin Thingvold noted that
21  Sheldon Thingvold preferred using equipment he was familiar with.
22  Edmonds and Classic Painting took no ownership interest in the
23  equipment and the Thingvolds received no compensation for the use
24  of the equipment.  Classic Painting paid for repairs to the
25  Thingvolds' equipment when it broke down.  The Thingvolds still
26  have some of the equipment.

27      Although Sherwin Thingvold testified that he drew a line in
28  Pro Kote's check register sometime after April 18, 2005, as a way
12 - FINDINGS OF FACT & CONCLUSIONS OF LAW

of showing when the Thingvolds began to work for Classic Painting, Sherwin Thingvold explained that on a few occasions after that date, he wrote a check to a former Pro Kote employee from the Pro Kote checkbook because the employee needed an advance or draw, on his paycheck.

As Sherwin explained it, at the time he and Sheldon Thingvold became employees of Classic Painting, the Thingvolds did not close out the Pro Kote bank account because Pro Kote was still expecting retention payments for their previous work and other deposits. They also still had outstanding bills to pay.  He kept the account open, but checks to employees written after the April 18, 2005 date were written on behalf of Classic Painting.

The check register, Exhibit 503, which starts with a check written in January 2005, shows that before April 15, 2005, Pro Kote wrote occasional draw checks to its employees, including some to plaintiffs.  After April 18, 2005, Pro Kote wrote six draw checks, including one to Morga-Colon, and one or two to Pineda-Marin.  Exh. 503 at pp. 7-10.  The last draw check in the record to anyone was dated June 20, 2005.  Id. at p. 9.

Sherwin Thingvold explained that at Pro Kote, the employees were paid monthly and after two weeks, or toward the middle of the month, the Thingvolds wrote draw checks to help the employees make it to their next paycheck.  He explained that after he went to work for Classic Painting, he traveled from job site to job site and because he did not have access to a checking account for Classic Painting or Edmonds, he wrote a few draw checks to some of the employees.  He noted that this practice was more efficient than driving across town to obtain a check from Edmonds.  He was then

13 - FINDINGS OF FACT & CONCLUSIONS OF LAW

reimbursed by Edmonds.

At times, the jobs were scattered around the Northwest and Sherwin Thingvold described that employees would be living in a hotel and eating in restaurants and waiting to obtain an advance on their pay. In those situations, Sherwin Thingvold felt the options were (1) to drive back to the Portland area, sometimes 300 miles away, secure a check for the employee and either mail it or deliver it personally; (2) give the employee an advance from his personal funds; (3) give the employee an advance from Pro Kote's checking account. He chose the third option. He did not seek permission from Edmonds to do it because, he explained, it was a prudent way to get the worker money, Edmonds agreed with him, and Edmonds reimbursed the money.

Sherwin Thingvold also explained why plaintiffs' pay stubs for paychecks issued January 2005 through September 2005 bear the same format even though, according to his own testimony, plaintiffs were no longer Pro Kote employees after the spring of 2005. See Exhs 1-4. Before hiring the Thingvolds and plaintiffs, Edmonds did his own payroll for his employees. Edmonds asked Sherwin Thingvold who the Thingvolds hired to prepare Pro Kote's payroll and Sherwin Thingvold gave Edmonds the name of the individual that Pro Kote used to prepare its paychecks. As Sherwin Thingvold explained it, the individual, Bob Blackmore, provided a service to Pro Kote in terms of preparation, but the Thingvolds still hand wrote the checks using the information Blackmore gave them.

Initially, after the Thingvolds became Classic Painting employees, Edmonds used Blackmore in this manner as well. According to Sherwin Thingvold, Edmonds continued to use Blackmore

14 - FINDINGS OF FACT & CONCLUSIONS OF LAW

through September 2005, but then changed to a different payroll administration company because Edmonds grew tired of writing the actual payroll checks longhand.   The new company prepared the checks as well as the check stubs and Edmonds only had to sign them.

III.  Plaintiffs' Hours

Morga-Colon testified that Pro Kote had a policy of not paying overtime for hours worked in a week beyond 40.  According to Morga-Colon, Morga-Colon was one of four employees who met with Sheldon Thingvold, before going to work for Classic Painting, about overtime.  Morga-Colon remembered that the meeting took place in the summer, but he could not remember the year or the month.  He identified the participants as Sheldon Thingvold, plaintiff Camacho-Oliva, one other individual whose name he could not remember, but who acted as a spokesperson, and himself.  According to Morga-Colon, Sheldon Thingvold explained that the Thingvolds could not pay overtime and that if required to pay overtime, the Thingvolds would simply hire additional workers and give everybody only eight hours of work per day.  Camacho-Oliva's testimony about this meeting corroborates Morga-Colon's testimony.

Morga-Colon and Camacho-Oliva also testified that after the meeting, they were asked to work overtime, they did so, and were not paid extra pay for the overtime hours worked.  Both of these plaintiffs confirmed that this policy continued after they went to work for Classic Painting.  While neither one offered specific testimony about specific weeks in which they worked more than 40 hours and for which they did not receive overtime pay, each of these plaintiffs testified to keeping a contemporaneous log of

15 - FINDINGS OF FACT & CONCLUSIONS OF LAW

hours while working for Pro Kote and then Classic Painting, beginning in January 2005 and continuing into January 2008. Exhs. 6, 6A, 7, 7A. Conceivably, by totaling the number of hours recorded in each week, one could determine the weeks in which these plaintiffs worked more than 40 hours.

In contrast to the testimony offered by Morga-Colon and Camacho-Oliva, Rojo-Garcia and Pineda-Marin offered no testimony about the overtime policy or the meeting regarding overtime with Sheldon Thingvold. Neither of these plaintiffs testified to having worked any hours over 40 for which they were not paid overtime. Rojo-Garcia was asked no questions about overtime. Pineda-Marin was asked only if he had ever worked more than 40 hours in a week. He was not asked when, for what employer, nor if he was paid overtime.

Although Rojo-Garcia testified that he kept a log of hours worked, he lost the records. He testified that he worked the same hours as the other three plaintiffs. Notably, however, the records of the other three plaintiffs show that they did not always work the same hours. See, e.g., Exh. 6 at p. 5 and Exh. 7 at p. 6 which show:

MARCH 2006

| DATE | Camacho-Oliva<br>Exhibit 6 | Morga-Colon<br>Exhibit 7 |
| --- | --- | --- |
| Weds. March 1 | 10 hours | 7 hours |
| Thurs March 2 | 9 hours | 7 hours |
| Fri March 3 | 10 hours | 8 hours |
| Sat March 4 | 8 hours | 6 hours |

At the pretrial conference, several exhibits, including

16 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Exhibit 8, were admitted into evidence.  Plaintiffs' Exhibit List identifies Exhibit 8 as Pineda-Marin's timesheets.  Exhibit 8 is similar to the logs of work hours kept by Morga-Colon and Camacho-Oliva seen in Exhibits 6, 6A, 7, and 7A.

In testifying about their hours, Morga-Colon and Camacho-Oliva identified the logs, explained they created the logs themselves, testified when they were created, and explained the format of the logs including how the Spanish words appearing there represented the months, and the letters were for the Spanish days of the week. In contrast, Pineda-Marin was never asked a single question about Exhibit 8 or Exhibit 8A and thus, there is no evidence in the record regarding who created the logs in Exhibit 8, when they were created, or what the numbers written there represent.

As to wages simply not paid at all, Morga-Colon testified that he was never paid for certain hours worked in late 2007 and early 2008.  Specifically, he stated that he was owed $337.50 for October 2007, $332 for December 2007, and that in January 2008, he worked a total of 48 hours for which he was not paid.

Camacho-Oliva testified that he was owed $332 for hours worked in December 2007 that were not paid, and that he worked 39 hours in January 2008 that have not been paid.

Rojo-Garcia testified that "at the end" he was not paid in full and it seemed like he was still owed wages for 180 hours worked.  Pineda-Marin testified that he was not paid completely, but he did not articulate relevant dates.  He also could not recall how many hours were unpaid or how much he was owed.  He stated that it was "written down in the file," but he never identified "the file," stating only "the one that is here."

17 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1          CONCLUSIONS OF LAW

2    I.   Thingvolds & Pro Kote as Employers

3         Under the Fair Labor Standards Act (FLSA), "[e]mployee" is

4    defined as "any individual employed by an employer."  29 U.S.C. §

5    203(e)(1).  "'Employ' includes to suffer or permit to work."  29

6    U.S.C. § 203(g).  "'Employer' includes any person acting directly

7    or indirectly in the interest of an employer in relation to an

8    employee[.]"  29 U.S.C. § 203(d).

9         In a 2009 case, the Ninth Circuit explained that

10             [w]e have held that the definition of "employer"
          under the FLSA is not limited by the common law concept
11        of "employer," but "'is to be given an expansive
          interpretation in order to effectuate the FLSA's broad
12        remedial purposes.'"  Lambert v. Ackerley, 180 F.3d 997,
          1011-12 (9th Cir. 1999) (en banc) (quoting Bonnette v.
13        California Health & Welfare Agency, 704 F.2d 1465, 1469
          (9th Cir. 1983)).  See also Real v. Driscoll Strawberry
14        Assocs., 603 F.2d 748, 754 (9th Cir. 1979).  The
          determination of whether an employer-employee
15        relationship exists does not depend on "isolated factors
          but rather upon the circumstances of the whole activity."
16        Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.
          Ct. 1473, 91 L. Ed. 1772 (1947).  The touchstone is the
17        "economic reality" of the relationship.

18             Where an individual exercises "control over the
          nature and structure of the employment relationship," or
19        "economic control" over the relationship, that individual
          is an employer within the meaning of the Act, and is
20        subject to liability.  Lambert, 180 F.3d at 1012
          (internal quotation marks and citations omitted).  In
21        Lambert, we upheld a finding of liability against a chief
          operating officer and a chief executive officer where the
22        officers had a "'significant ownership interest with
          operational control of significant aspects of the
23        corporation's day-to-day functions; the power to hire and
          fire employees; [the power to] determin[e][ ] salaries;
24        [and the responsibility to] maintain [ ] employment
          records.'"  Lambert, 180 F.3d at 1001-02, 1012 (quoting
25        the district court's jury instruction).  "The evidence,
          moreover, strongly supports the jury's determination that
26        both Ackerleys exercised economic and operational control
          over the employment relationship with the sales agents,
27        and were accordingly employers within the meaning of the
          Act."  Id. at 1012.  See also Chao v. Hotel Oasis, Inc.,
28        493 F.3d 26, 34 (1st Cir. 2007) (holding corporation's

18 - FINDINGS OF FACT & CONCLUSIONS OF LAW

president personally liable where he had ultimate control over business's day-to-day operations and was the corporate officer principally in charge of directing employment practices); <u>United States Dep't of Labor v. Cole Enters., Inc.</u>, 62 F.3d 775, 778-79 (6th Cir. 1995) (president and 50 percent owner of corporation was "employer" within FLSA where he ran business, issued checks, maintained records, determined employment practices and was involved in scheduling hours, payroll and hiring employees).

<u>Boucher v. Shaw</u>, 572 F.3d 1087, 1091-92 (9th Cir. 2009).

In <u>Bonnette</u>, cited by <u>Boucher</u>, the court explained that in determining whether a defendant is an "employer" under the FLSA, courts are to consider the totality of the circumstances of the relationship, including whether the alleged employer has the power to hire and fire the employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records. <u>Bonnette</u>, 704 F.2d at 1470, <u>abrogated on other grounds</u>, <u>Garcia v. San Antonio Metro. Transit Auth.</u>, 469 U.S. 528, 539 (1985)). However, the court also noted that these factors are "not etched in stone and will not be blindly applied." <u>Id.</u>

The <u>Bonnette</u> court considered these factors in the context of a "joint employer" argument. The court explained that two or more employers may jointly employ someone for purposes of the FLSA and that all joint employers are individually responsible for compliance with the FLSA. <u>Id.</u>

The Department of Labor's regulation sets forth examples of joint employment situations: (1) where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or (2) where one employer is acting directly or indirectly in the interest of the other employer

19 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1 (or employers) in relation to the employee; or (3) where the
2 employers are not completely disassociated with respect to the
3 employment of a particular employee and may be deemed to share
4 control of the employee, directly or indirectly, by reason of the
5 fact that one employer controls, is controlled by, or is under
6 common control with the other employer. 29 C.F.R. § 791.2(b).

7     <u>Bonnette</u> also held that the determination of the status of
8 employer under the FLSA was a question of law. "We agree with the
9 Eighth Circuit and the most recent Fifth Circuit precedent.
10 Although the underlying facts are reviewed under the clearly
11 erroneous standard, the legal effect of those facts-whether
12 appellants are employers within the meaning of the FLSA-is a
13 question of law."  704 F.2d at 1469.

14     Under these principles, the Thingvolds and Pro Kote were not
15 employers of plaintiffs after the transition to Classic Painting.
16 The facts establish that once the Thingvolds ended their business
17 Pro Kote, they became employee supervisors, acting on behalf of
18 Classic Painting, with regard to plaintiffs.  Even accepting that
19 they had more authority than the "team leader" position described
20 by some of the plaintiffs and held by various Classic Painting
21 employees including Duran and Pineda-Marin, the undisputed evidence
22 remains that the Thingvolds did not have the power to hire or fire
23 plaintiffs or discipline plaintiffs.

24     Certainly, the Thingvolds recommended that Edmonds hire
25 plaintiffs when Classic Painting took over Pro Kote.  But, there is
26 no evidence in the record establishing that Edmonds was required to
27 do so or that hiring plaintiffs was part of any bargain struck by
28 the Thingvolds and Edmonds when Classic Painting hired the

20 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1   Thingvolds.    The evidence that the Thingvolds did not have
2   authority to fire or discipline plaintiffs is undisputed.

3       Similarly, while the Thingvolds had paid plaintiffs a certain
4   hourly wage when the plaintiffs were employees of Pro Kote, Classic
5   Painting was not obligated by any agreement with the Thingvolds to
6   continue to pay plaintiffs those hourly wages.  Edmonds could have
7   followed the recommendations of the Thingvolds or not, as he chose.
8   Although Morga-Colon testified that Sherwin Thingvold was
9   responsible for his raise while he was employed by Classic
10  Painting, he failed to explain the basis for his knowledge.  The
11  Thingvolds explained that Edmonds and Classic Painting made those
12  determinations, although they may have been asked for a
13  recommendation.

14      It is also undisputed that Classic Painting issued all of
15  plaintiffs' paychecks beginning sometime in late spring 2005.
16  Beginning in October 2005, the check stubs in the record bear the
17  name of Classic Painting.   The only actual check in the record
18  bears Edmonds's signature.  Sherwin Thingvold's testimony regarding
19  Edmonds's use of the Thingvolds' payroll administrator for the
20  first several months that Classic Painting employed plaintiffs is
21  undisputed.

22      Additionally, there is no evidence in the record showing that
23  the Thingvolds maintained any employment-related or payroll records
24  of plaintiffs once Pro Kote ceased to exist, and no evidence they
25  issued any such records, including W-2s or other tax-related
26  employment records.

27      Thus, while the Thingvolds supervised crews at certain work
28  sites and engaged in certain supervisory-related tasks such as

21 - FINDINGS OF FACT & CONCLUSIONS OF LAW

distributing paychecks, they did not set wages, did not have the authority to hire, fire, or discipline, did not issue paychecks, and did not maintain or generate employment and wage-related documents.

Plaintiffs' testimony that the Thingvolds, in their supervisory roles, had some control over employee work schedules and, in the winter, some control over who worked when painting jobs were more scarce, is largely undisputed. Plaintiffs' daily work logs, however, with the exception of Rojo-Garcia's logs which he apparently lost, show that plaintiffs worked, uninterrupted, close to or more than 40 hours each week, from July 2005 until December 2007 - January 2008. Thus, while plaintiffs testified that the Thingvolds had some authority over work hours in theory, that authority was never apparently exercised to plaintiffs' detriment. This diminishes the weight of plaintiffs' testimony on this issue.

Status as a supervisor and execution of certain duties attendant to that status, e.g. scheduling shifts, collection of hours, distribution of paychecks, recommendations regarding raises, and instruction, are not enough, without more, to make the supervisor an "employer" for purposes of the FLSA. Even given the breadth of the statutory definition, if supervisory status alone rendered a supervisor an FLSA "employer," then every supervisor in every company would be individually liable for FLSA damages as an employer.

Cases support the point that supervisors are considered "employers" under the FLSA only when they exercise something more than common employee supervision. E.g., Chao v. Hotel Oasis, Inc., 493 F.3d 26, 33-34 (1st Cir. 2007) ("not every corporate employee

22 - FINDINGS OF FACT & CONCLUSIONS OF LAW

who exercise[s] supervisory control should be held personally
liable [under the FLSA]"; finding that president of corporation who
was corporate officer in charge of hiring, firing, attendance at
meetings, wages, and schedules was "employer" under FLSA), <u>citing</u>
<u>Donovan v. Agnew</u>, 712 F.2d 1509, 1510, 1511, 1513-14 (1st Cir.
1983) (noting it "difficult to accept . . . that Congress intended
that any corporate officer or other employee with ultimate
operational control over payroll matters be personally liable
[under the FLSA]," but concluding that the FLSA did not preclude
personal liability for "corporate officers with a significant
ownership interest who had operational control of significant
aspects of the corporation's day to day functions, including
compensation of employees[.]"); <u>see also</u> <u>Rivera-Triado v. Autoridad</u>
<u>de Energia Electrica</u>, No. 06-1928(DRD), 2009 WL 3347455, at * 3-4
(D.P.R. Sept. 1, 2009) (absent evidence that the two supervisors
were corporate officials, controlling of the business's day to day
operations, or were in charge of hiring, firing, and setting wages,
they were not "employers" under FLSA definition); <u>Stuart v. Regis</u>
<u>Corp.</u>, No. 1:05CV00016DAK, 2006 WL 1889970, at *6 (D. Utah July 10,
2006) (noting that definition of "employer" for federal Family
Medical Leave Act (FMLA) is the same as that used in the FLSA and
holding that supervisor with authority to provide oral and written
reviews of employee's performance and issued written warnings, was
not "employer" under that definition when supervisor did not hold
a corporate officer position; stating that "[i]ndividuals who have
no corporate role beyond a managerial position are not
employers[.]"); <u>Keene v. Rinaldi</u>, 127 F. Supp. 2d 770, 777 n.3
(M.D.N.C. 2000) ("neither the FLSA nor the FMLA were intended to

23 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1  impose liability on mere supervisory employees as opposed to
2  owners, officer, etc.").

3      The use of the Thingvolds' equipment and Sherwin Thingvolds'
4  few occasions of writing a draw check to certain Classic Painting
5  employees in the first couple of months after the transition from
6  Pro Kote to Classic Painting, are not enough to establish the
7  Thingvolds or Pro Kote as employers. The Thingvolds' equipment was
8  not the only equipment used by Classic Painting employees. And,
9  Sherwin Thingvold wrote a total of six draw checks between April
10 18, 2005, and June 20, 2005. The undisputed evidence is that he
11 was reimbursed by Edmonds. Thingvold's explanation makes sense.
12 Indeed, one pay stub in fact reflects the advance and later
13 deduction in pay. Exh. 503 at p. 7 (Pro Kote check register
14 showing $400 draw check to Morga-Colon on May 18, 2005); Exh. 2 at
15 p. 3 (pay stub dated June 3, 2005 showing $400 draw deducted from
16 wages). When these facts are examined as part of the totality of
17 the circumstances, they do not change the more determinative facts
18 regarding the relatively little economic power the Thingvolds held
19 over plaintiffs after the Thingvolds themselves became employees of
20 Classic Painting. Under the economic realities test used to
21 determine employer status for the purposes of the FLSA, the
22 evidence at trial shows that the Thingvolds and Pro Kote were not
23 plaintiffs' employers.

24      During closing argument, plaintiffs' counsel noted that in the
25 Pretrial Order, Pro Kote and the Thingvolds agreed with plaintiffs
26 that Morga-Colon, Camacho-Oliva, and Rojo-Garcia were employed by
27 Pro Kote through September 2, 2005. PTO at ¶¶ 3.5, 3.6, 3.7.
28 These parties further agreed that Pineda-Marin was employed by Pro

24 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1  Kote through May 20, 2005.  Id. at ¶ 3.4.  Counsel for Pro Kote and

2  the Thingvolds responded that these agreed facts were an oversight

3  on his part, that he had been mistaken in agreeing to them, and

4  that he did not intend to agree to them.  He stated that in fact,

5  Pro Kote and the Thingvolds disputed that the plaintiffs were

6  employees of Pro Kote after the transition to Classic Painting in

7  the spring of 2005.  These agreed facts also came as a surprise to

8  the Court because during the trial, no one had drawn any attention

9  to these agreed facts or suggested that there was any stipulation

10 regarding a joint employment relationship for any period of time.

11 Rather, the entire case was tried based on the competing theories

12 of plaintiffs (that Pro Kote and the Thingvolds beginning in the

13 spring of 2005 became joint employers of plaintiffs with Classic

14 Painting and Edmonds), as opposed to the Thingvolds' and Pro Kote's

15 theory (that Classic Painting and Edmonds became the only employers

16 of plaintiff and the Thingvolds in the spring of 2005).

17      Generally, a pretrial order supersedes the pleadings and the

18 parties are bound by its contents.  Patterson v. Hughes Aircraft

19 Co., 11 F.3d 948, 950 (9th Cir. 1993); see also Fed. R. Civ. P.

20 16(d) (pretrial orders issued by the court control the course of

21 the action unless modified by the court); Fed. R. Civ. P. 16(e)

22 (final pretrial order modified by court only to prevent manifest

23 injustice).

24      Nonetheless, a district court is given broad discretion in

25 supervising the pretrial phase of litigation and "its decisions

26 regarding the preclusive effect of a pretrial order on issues of

27 law and fact at trial will not be disturbed unless they evidence a

28 clear abuse of discretion."  Miller v. Safeco Title Ins. Co., 758

25 - FINDINGS OF FACT & CONCLUSIONS OF LAW

F.2d 364, 369 (9th Cir. 1985).

Importantly, a pretrial order may be amended by a trial court's findings when facts supporting those findings are put before the court. Id. at 368; see also Sauers v. Alaska Barge, 600 F.2d 238, 244 (9th Cir. 1979) (court may treat a pretrial order as amended to conform to the evidence as actually presented).

Here, although the Pretrial Order's agreed facts are that three of the plaintiffs were employed by Pro Kote until early September 2005, the Thingvolds both testified that plaintiffs became employees of Classic Painting after March or April 2005, and accordingly, were no longer employed by Pro Kote and the Thingvolds. Plaintiffs did not object to this testimony, even though such an objection would have been well taken. See United States v. First Nat'l Bank of Circle, 652 F.2d 882, 886 (9th Cir. 1981) (one objective of the final pretrial conference and pretrial order is to simplify issues and avoid unnecessary proof by obtaining admissions of fact; thus, a party may not offer evidence at trial which contradicts the pretrial order's terms).

Additionally, this case, compared with many, was in a state of disarray during the time pretrial documents were being drafted and filed, and at the time of the pretrial conference, it was unclear if the case was going to trial as scheduled, and if so, with how many parties. The pretrial conference was scheduled for January 29, 2010, with pretrial documents due on January 4, 2010, January 11, 2010, and January 19, 2010. The Pretrial Order was due on January 4, 2010.

On December 29, 2009, counsel for Classic Painting and Edmonds filed a motion to withdraw as counsel for Edmonds, citing Edmonds's

26 - FINDINGS OF FACT & CONCLUSIONS OF LAW

recent retention of a bankruptcy attorney in connection with the pending claims against him, and the potential conflict for counsel to continue to represent both the corporate defendant and Edmonds. On January 8, 2010, I denied the motion with leave to renew it at a later date.  At this point, the impending bankruptcy of Edmonds and the possible withdrawal of his counsel created some uncertainty about the trial date.  Moreover, there was some suggestion that the Thingvolds may file for bankruptcy as well, although it was not clear if that would occur, if at all, before or after the trial.

Nonetheless, the pretrial conference was held as scheduled. During that pretrial conference, the parties waived a jury and decided to proceed with a trial to the court.  The parties also discussed the impact of a bankruptcy filing by Edmonds, which had not yet occurred, and whether plaintiffs would dismiss him from the case upon such filing.  It was also revealed that due to the financial circumstances of all the parties in the case, no depositions had ever been taken.

Seven days after the pretrial conference, the Court learned of the "settlement" between Classic Painting, Edmonds, and plaintiffs. As it turns out, the settlement was actually an agreement that a stipulated judgment against Classic Painting and Edmonds would be entered, but no immediate or voluntary payment of money by these defendants to plaintiffs was contemplated.  Plaintiffs were to tender a proposed judgment against Classic Painting and Edmonds to the Court on February 8, 2010.  None has been tendered as of March 25, 2010, at 9:30 a.m.

Finally, the agreed facts in the Pretrial Order are a bit confusing.  They appear in a section labeled "3. AGREED FACTS."

27 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Pretrial Order at p. 2. Following this is a sentence reciting that plaintiffs, Pro Kote, and the Thingvolds "agree to the following facts:". Then, several numbered facts, from 1 to 7, appear. Id. After this is a sentence reciting that plaintiffs, Classic Painting, and Edmonds "agree to the following facts:". Then, several numbered facts, from 1 to 17, appear. Id. at p. 3. Several of the agreed facts to which Pro Kote and the Thingvolds agreed actually address issues relevant only to Classic Painting and Edmonds. Id. at p. 2. It is unclear why they are in this section. Moreover, given that the parties represented at the pretrial conference that no depositions had been taken, the basis for agreeing to certain facts is unclear.

Given the evidence presented regarding the time period when the Thingvolds and Pro Kote no longer employed plaintiffs, and the lack of objection to it, I consider the Pretrial Order amended to conform to the evidence actually presented at trial and thus, I do not find the agreed facts on this issue preclusive. My determination is influenced by the general confusion surrounding the case in the weeks immediately preceding the trial, including the confusing presentation of the agreed facts in the Pretrial Order itself. While I do not excuse the lack of attention to detail by counsel for Pro Kote and the Thingvolds, I note the confusing circumstances as a way of explanation and as support for finding the Pretrial Order amended.

Alternatively, even if I accepted the agreed facts regarding the duration of Pro Kote's employment of plaintiffs, those facts create no liability for Pro Kote. The Complaint in this case was filed on July 2, 2008. The Oregon statutory claims, discussed more

28 - FINDINGS OF FACT & CONCLUSIONS OF LAW

fully below, carry two-year statutes of limitations. Oregon
Revised Statute § (O.R.S.) 12.110(3). Thus, even if Pro Kote and
the Thingvolds were plaintiffs' employers up to September 2, 2005,
there is no liability, under Oregon statutory wage law, for any
conduct occurring before July 2, 2006.

The FLSA also carries a two-year statute of limitations. 29
U.S.C. § 255(a). However, in the case of a willful violation, the
limitations period is extended to three years. Id. Plaintiffs
here have no minimum wage claims in the period July 2, 2005, to
July 2, 2006. Thus, any willfulness triggering a three-year FLSA
statute of limitations must relate to the failure to pay overtime.

"A violation of the FLSA is willful if the employer knew or
showed reckless disregard for the matter of whether its conduct was
prohibited by the FLSA." Chao v. A-One Med. Servs., Inc., 346 F.3d
908, 919 (9th Cir. 2003) (internal quotation and brackets omitted).
In this case, there is no dispute that even if the Thingvolds and
Pro Kote were considered "employers" of three of the plaintiffs
until September 2, 2005, they were not authorized to execute
paychecks and were not responsible for wage policy. Although the
testimony regarding the Thingvolds' overtime policy while
plaintiffs were employed solely by Pro Kote would establish
willfulness sufficient to trigger the three-year limitations
period, there is no evidence that the Thingvolds and Pro Kote, as
opposed to Edmonds, were responsible for maintaining and enforcing
that policy after April or May 2005. Therefore, even accepting the
agreed fact that Morga-Colon, Camacho-Oliva, and Rojo-Garcia were
employed by Pro Kote until September 2, 2005, in this situation of
joint employment with Classic Painting, the willfulness required to

29 - FINDINGS OF FACT & CONCLUSIONS OF LAW

extend the limitations period from two to three years cannot be attributed to the Thingvolds under the facts of this case. Accordingly, even if the Thingvolds and Pro Kote employed these three plaintiffs until September 2, 2005, there is no liability for the overtime violations during that time period.

As to the non-FLSA claims, the definition of "employer" under the Oregon statute for purposes of plaintiffs' minimum wage and overtime claims, is "any person who employs another person . . . ." O.R.S. 653.010(3).   "'Employ' includes to suffer or permit to work[.]"  O.R.S. 653.010(2).  As with the FLSA, the determination of employer status for Oregon wage claims is a question of law. Roberts v. Bomareto Enters., Inc., 153 Or. App. 183, 186, 956 P.2d 254, 255 (1998).

Oregon cases do not clearly articulate the proper analysis used to determine the status of "employer" under O.R.S. 653.010(3). In Chard v. Beauty-N-Beast Salon, 148 Or. App. 623, 941 P.2d 611 (1997), the court noted that courts in earlier cases and the Oregon Bureau of Labor and Industries (BOLI) used the common law "right to control" test when "distinguishing an employee from an independent contractor for purposes of ORS chapter 653." Id. at 628, 941 P.2d at 613.  In Bomareto, the court recognized that the provisions and definitions in O.R.S. Chapter 653 are patterned after the FLSA. Bomareto, 153 Or. App. at 187 n.3, 956 P.2d at 255 n.3.  However, the court had no reason to further explain the factors or test used to determine "employer."

In Roberts v. Acropolis McLoughlin, Inc., 149 Or. App. 220, 942 P.2d 829 (1997), the court noted that under the FLSA, the "employment relationship" test is one of "economic reality."  Id.

30 - FINDINGS OF FACT & CONCLUSIONS OF LAW

at 224, 942 P.2d at 831.  On appeal to the court, BOLI argued that the trial court erred by including elements of the common law right to control test because, according to BOLI, only the economic realities test applied.  Id. at 226, 942 P.2d at 832.  The court refused to decide the issue because it had not been raised before the trial court.

Under the economic realities test as articulated by the Ninth Circuit for FLSA claims, Pro Kote and the Thingvolds are not employers.  If this is the proper test used for Oregon statutory wage claims, these defendants are not employers under Oregon law. If the common law right to control test is used, however, the Thingvolds and Pro Kote are still not employers.  The Thingvolds, after they became employees of Classic Painting, did not retain the right to hire, fire, or discipline employees.  They did not pay plaintiffs.  They furnished some, but not all, of the equipment. They supervised certain parts of the plaintiffs' work, but other team leaders also shared in some of that responsibility. Viewed in totality, the Thingvolds and Pro Kote did not exercise sufficient control under the common law "right to control" test, to be considered employers under O.R.S. Chapter 653.

As to the late payment of termination claim under O.R.S. 652.140, "employer" is not separately defined in the statutes. However, because the statute addresses the payment of wages on termination, it presupposes an employment relationship and there is no basis for defining "employer" any differently than for the wage claims found in O.R.S. Chapter 653.  For the reasons previously articulated, the Thingvolds and Pro Kote are not employers for the purposes of the O.R.S. 652.140 claim.

31 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1    Finally, as to the breach of contract claim, plaintiffs fail
2  to establish that they had an employment contract with Pro Kote and
3  the Thingvolds in 2007 and 2008, the time period for which they
4  seek unpaid wage damages under the contract claim.
5  II.  Issues with Proof of Damages
6    Given my conclusion that the Thingvolds and Pro Kote were not
7  employers for any of plaintiffs' claims, I need not address any
8  issues related to damages.   However, for the benefit of the
9  parties, I note that should it be necessary to analyze the damages
10 claims in this case, the following are issues of concern:
11   (1)  Testimony:  as noted above, Rojo-Garcia and Pineda-Marin
12 failed to testify that they were not paid one and one-half times
13 their regular hourly rate for hours worked in excess of 40 in one
14 week.  Rojo-Garcia has no written log of hours to rely on in place
15 of testimony.  His testimony that he worked the same hours as the
16 other three plaintiffs is not reliable given that the logs of the
17 other three plaintiffs show that they occasionally worked different
18 hours from each other.  Pineda-Marin gave no testimony whatsoever
19 about the logs in Exhibit 8, making them of no value.
20   Additionally, Pineda-Marin gave no testimony as to the number
21 of hours he worked in 2007 and 2008 that were unpaid.  The basis
22 for Rojo-Garcia's testimony that he worked 180 unpaid hours in that
23 time period was not established and his testimony on this issue is
24 questionable given that he has no written records, could not
25 remember how much money he was owed for these unpaid hours, and
26 testified that it "seemed" like there were 180 unpaid hours.  This
27 evidence does not establish a credible, just and reasonable
28 estimate of hours worked.

32 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Although in the absence of records kept by an employer, a plaintiff in an FLSA wage case carries his burden of showing uncompensated hours with evidence establishing the amount and extent of work by "just and reasonable inference," <u>Anderson v. Mount Clemens Pottery Co.</u>, 238 U.S. 680, 687 (1946), Pineda-Marin and Rojo-Garcia's testimony as to overtime and unpaid pages fails to meet that burden.

(2)  Exhibits 6, 6A, 7, 7A, 8, 8A

At the pretrial conference, I received plaintiffs' Exhibits 6, 7, and 8 into evidence.  Plaintiffs identified the exhibits as follows:  Exhibit 6:  Timesheets of Camacho-Oliva; Exhibit 7: Timesheets of Morga-Colon; Exhibit 8: Timesheets of Pineda-Marin. At that time, the Court and the parties had before them copies of logs of hours maintained by plaintiffs.  Exhibits 6 and 7 showed that the logs had been made in spiral notebooks.  The copy of Exhibit 8 did not reveal if the logs were kept in a bound notebook, a pad of paper, or on a series of single sheets of paper.

The first morning of trial, when, pursuant to the trial management order, the parties are expected to bring the originals of exhibits with them for use by witnesses, plaintiffs' counsel presented only copies of these exhibits.  During trial, I inquired about the original logs.  The following morning, plaintiffs' counsel tendered what were then marked and received as Exhibits 6A, 7A, and 8A.  Exhibits 6A and 7A are the actual spiral bound notebooks.  Exhibit 8A is the original single pages of paper held together with a paper clip.

In discussions with counsel, on the record, I noted one discrepancy between Exhibit 6 and Exhibit 6A in that Exhibit 6A had

33 - FINDINGS OF FACT & CONCLUSIONS OF LAW

two pieces of paper for "Enero 2008" (meaning January 2008), one of which was torn loose from the spiral binding, but was still in the notebook.  Both showed the same days of the week, January 2d through 10th, 2008, and both showed the same hours worked, although the loose sheet has two days which were corrected.  The loose sheet also contains writing at the bottom of the log which recites "TOTAL 39 hrs. TOTAL $507."  The sheet for January 2008 which is still bound to the notebook does not contain the total.  It does, however, contain the words "debe todo" next to the entry for January 4, 2008.  Although not officially translated by the interpreter used for this trial, plaintiffs' counsel offered that the meaning of "debe todo" is "total owed."

As for Exhibits 7 and 7A, there are also some inconsistencies between the copy and the original bound notebook.  Page 28 of Exhibit 7 is a log for "ENE 08," meaning January 2008.  It follows the page on which hours for October, November, and December 2007 were kept.  Exh. 7 at p. 27.  Page 28 has the year 2008 written in the middle of the top margin, and Morga-Colon's name written on the top right corner.  It lists the numbers 2, 3, 4, 7, 8, 9 down the left side, with, presumably, the number of hours worked each one of those days.  At the bottom is written "TOTAL = 48 horas    Debe Todo."  Exh. 7 at p. 28.

The corresponding page in the original spiral notebook follows the page on which hours for October, November, and December 2006, not 2007, were kept.  Exh. 7A.  Additionally, the corresponding page in the original exhibit says "ENERO 2008," not "ENE 08."  Id. And, in the original exhibit, the words "TOTAL = 48 horas    Debe Todo" do not appear anywhere on that page.  Id.

34 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Adding to the confusion is a page in the original notebook which almost matches page 28 of Exhibit 7, except for the absence of the words "TOTAL = 48 horas   Debe Todo." This page is torn from the spiral binding and is tucked in after the last page on which hours are recorded. <u>Id.</u>

Finally, as to Exhibits 7 and 7A, the original notebook in Exhibit 7A contains two pages which appear to total hours, by month, for years 2005, 2006, and 2007. <u>Id.</u> One of them shows monthly hours well over 100, with the exception of July and August 2006. <u>Id.</u> The other has headings 205, 206, 207, instead of 2005, 2006, and 2007, and shows significantly fewer hours each month. <u>Id.</u> Only the first of these pages appears in Exhibit 7. Exh. 7 at p. 29.   There is no explanation for the difference or what is represented on the second of the two pages in Exhibit 7A.

As to Exhibits 8 and 8A, the most noticeable difference between the two is that the pages in Exhibit 8 are not in any chronological order while in Exhibit 8A, they begin with January 2005 and proceed, more or less one month to a page, through December 2007, with the final page containing hours for both January and February 2008.  Exhibit 8A has one page with hours for July 2005 continued on the back of the page.  This page is missing from Exhibit 8.

Curiously, although Morga-Colon and Camacho-Oliva testified that they created the logs by writing their hours worked each day, all of the entries for the three-year period of January 2005 to January 2008, look to have been made by the same pen.  Exh. 6A, Exh. 7A.  This is also the appearance of the log kept by Pineda-Marin.  Exh. 8A.

35 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1     Although under Federal Rule of Evidence 1003 a duplicate may

2    be used in place of an original, the discrepancies between the

3    originals (Exhibits 6A, 7A, 8A), and the duplicates (Exhibits 6, 7,

4    8) in either content or form indicate that the originals should be

5    used.  Given the manner in which these logs were kept by writing

6    entries in the same manner every day for three years with what

7    appears to be the same pen, I question the accuracy of the

8    testimony that these logs were made contemporaneously with the

9    hours worked.  If indeed they were not contemporaneously made, I

10    have no confidence in the accuracy of the data these logs contain

11    and in fact, the credibility of plaintiffs is seriously undermined.

12         (3)  Exhibit 8

13         I have previously mentioned the lack of testimony by Pineda-

14    Marin regarding Exhibit 8.  Even though the exhibit was received,

15    without any testimony by Pineda-Marin or anyone else about who kept

16    the records and that they are an accurate record of the hours he

17    worked, and that the record was generated when the information was

18    fresh in his mind, the information contained in the exhibit carries

19    no weight.

20         (4)  Weeks with Unpaid Overtime Hours

21         Although Morga-Colon and Camacho-Oliva testified that they

22    worked more than 40 hours in one week and did not receive one and

23    one-half times their regular wage for such hours, they did not

24    specify the exact weeks in which this occurred.  Presumably then,

25    plaintiffs left this determination up to the factfinder who then

26    has to comb through each of the logs in Exhibits 6 or 6A, or

27    Exhibits 7 or 7A, and manually add up the hours in each week to

28    determine which weeks were weeks in which these plaintiffs were not

36 - FINDINGS OF FACT & CONCLUSIONS OF LAW

paid overtime, and how many total hours of overtime are in evidence. While Morga-Colon and Camacho-Oliva both testified that they received raises at some point while working for Classic Painting, they did not testify when those raises occurred, making it impossible for the factfinder to determine, based on testimony and the logs, what hourly rate to use to calculate the overtime owed, if the weeks in which overtime occurred can be reliably determined.

Although in theory it might be possible for the factfinder to determine the hourly rate by looking at the pay stubs in Exhibits 1 (Camacho-Oliva) and 2 (Morga-Colon), the pay stubs are not entirely clear on this point. For example, the pay stub dated March 4, 2005 for Camacho-Oliva shows a rate of $12 per hour. Exh. 1 at p. 2. The pay stub dated August 2, 2005, shows a rate of $12.32 per hour and the one dated September 2, 2005, shows a rate of $13.30 per hour. Id. at p. 4. Between October 2005 and March 2006, the following hourly rates appear on the pay stubs for Camacho-Oliva: $13, $13.98, $13.78, $14.10, and $13.66. Id. at pp. 5-7. From March 2006 until December 2007, the rate holds steady at $13 per hour. Id. at pp. 8-20.

Another factor complicating the calculation is that the pay stubs dated June 2005 through October 2006 do not reveal the pay period for which the pay check was issued. Id. at pp. 3-11. Because the pay stubs during this period of time were apparently issued monthly, it is reasonable to assume that the July 1, 2005 pay stub, for example, likely accompanied a paycheck issued for hours worked in June 2005, the preceding month. The July 1, 2005 pay stub shows a total of 200 hours worked. Id. at p. 3. Based on

37 - FINDINGS OF FACT & CONCLUSIONS OF LAW

the reasonable assumption that these were hours worked in June 2005, one would expect that the log kept by Camacho-Oliva for hours worked in June 2005, would total 200. It does not. Rather, the log in Exhibit 6 shows that Camacho-Oliva worked 205 hours in June 2005. Exh. 6 at p. 2.

Curiously, while the July 1, 2005 pay stub shows 200 hours worked in some undefined pay period, the log in Exhibit 6 shows 200 hours worked in July 2005. Compare Exh. 1 at 3 with Exh. 6 at p. 3. And, the June 3, 2005 pay stub shows 205 hours worked in some undefined pay period while the log in Exhibit 6, as noted above, shows 205 hours.

Unless plaintiffs were being paid in advance, which is not the testimony, the fact that the June 3, 2005 pay stub shows 205 hours worked and the log kept for June 2005 shows 205 hours worked, and the fact that the July 1, 2005 pay stub shows 200 hours, and the log kept for July 2005 shows 200 hours worked, reasonably suggests that plaintiffs created the logs after the fact by looking at the total hours worked on the pay stub for a particular month, and then listing in their logs the daily hours for that month that equaled the total on the pay stub. Because this is the most reasonable inference created by this evidence, plaintiffs' testimony that their logs were created contemporaneously with the days actually worked, is completely undermined.

Another problem is found in the pay stubs starting October 31, 2006, and continuing through December 2007. Exh. 1 at pp. 12-20. These pay stubs do reveal a start and end date of the relevant pay period. Id. Nonetheless, there are problems with some of the records. The first one in this sequence shows a start and end day

38 - FINDINGS OF FACT & CONCLUSIONS OF LAW

of October 31, 2006.  Id. at p. 12.  Given that the prior pay stub
is dated October 3, 2006, and following the assumption noted above,
was presumably for the pay check covering hours worked in the month
of September 2006, it is possible that the October 31, 2006 start
day was a mistake and should have been October 1, 2006, with an
ending date of October 31, 2006.  However, the total hours worked
indicated on that pay stub is 104, while the log of hours kept by
Camacho-Oliva for the month of October 2006, is 194.5.  Thus, the
pay stub with the start and end date of October 31, 2006, remains
unclear.

Additionally, while the pay stubs for pay periods beginning
November 1, 2006, then appear semi-monthly, there are gaps and
other problems.  There is no pay stub for the period December 16,
2006, to December 31, 2006, or for the period January 1, 2007, to
January 15, 2007.  The stubs resume for the period January 16,
2007, to January 31, 2007, and then for two periods in February
2007.  Exh. 1 at pp. 14-15.  Next is a pay stub covering the period
March 1, 2007, to March 16, 2007, showing pay for 89.5 hours
worked, followed by one covering the period March 10, 2007, to
March 15, 2007, showing pay for 109.5 hours worked.  Id. at pp. 15-
16.  There is no explanation for this overlap.

Then, there is a pay stub for the period April 1, 2007, to
April 15, 2007, showing pay for 101 hours worked, followed by a pay
stub for April 1, 2007, to April 30, 2007, showing pay for 212
hours worked.  Again, there is no explanation for this overlap.

Given my conclusion that the Thingvolds and Pro Kote are not
employers for the purposes of any of plaintiffs' claims, I need not
provide details of similar problems with the other exhibits

39 - FINDINGS OF FACT & CONCLUSIONS OF LAW

1   containing pay stubs and the attempt to cross-reference the pay

2   stubs with the log of hours worked.  The examples noted above are

3   enough to show that the factfinder's attempt to accurately

4   determine the number of overtime hours worked as a matter of just

5   and reasonable estimate and which were not paid, is not possible on

6   the record submitted at trial.

7          (5)  Penalty Wages

8          Finally, even if the Thingvolds and Pro Kote were determined

9   to be joint employers with Classic Painting, plaintiffs are limited

10  in the amount of penalty wages they may collect under Oregon law.

11  First, if plaintiffs succeed on their minimum wage or overtime

12  claims under Oregon law, they are entitled to penalty wages under

13  O.R.S. 652.150, which provides, essentially, a penalty wage of

14  eight hours of the employee's wages multiplied by thirty days.

15  Following Magistrate Judge Stewart's well-reasoned opinion in

16  Mathis v. Housing Auth. of Umatilla County, 242 F. Supp. 2d 777,

17  787 (D. Or. 2002), plaintiffs here cannot obtain penalty wages

18  under O.R.S. 652.150 for overtime or minimum wage violations and

19  also seek to extend the FLSA's two-year statute of limitations to

20  three years because both the O.R.S. 652.150 penalty wages and the

21  willfulness determination required to extend the FLSA's limitations

22  period, are penal in nature and the law does not tolerate the

23  duplicate penalty.  Id. at 790.

24         Second, although the cases are a bit more complicated to

25  synthesize, I am convinced that in the end, plaintiffs cannot

26  recover penalty wages under O.R.S. 652.150 for the overtime

27  violation under O.R.S. 653.261 and allowed under O.R.S. 653.055,

28  and simultaneously recover penalty wages under O.R.S. 652.150 for

40 - FINDINGS OF FACT & CONCLUSIONS OF LAW

the separate violation of late payment of termination under O.R.S.
652.140 because, for the overtime claim, the violations are based
on the same conduct.  That is, to the extent the separate O.R.S.
652.140 violation is based on the failure to pay the overtime
allegedly owed under O.R.S. 653.251, there is a double recovery for
the same conduct.  <u>See</u> <u>Mathis</u>, 242 F. Supp. 2d at 788 (explaining
that when the defendant committed only one wrongful act of failing
to pay overtime, the plaintiff was limited to recovery of only one
penalty under O.R.S. 652.150; a violation of the overtime statute
did not automatically trigger a second violation of the statute
requiring prompt payment of all wages due and owing at
termination).

　　　　The same does not hold true, however, for the penalty wages
assessed for the violation of the state minimum wage statute.  The
distinction is that because plaintiffs have still not been paid for
certain hours worked in late 2007 and early 2008, they were not
paid for those hours by their next regular payday.  This
establishes a separate violation of the failure to pay those wages
in addition to the initial failure to pay them.  Thus, if the
Thingvolds and Pro Kote were plaintiffs' employers, plaintiffs
could likely recover penalty wages for the state minimum wage
violation and also recover penalty wages for the late payment of
wages upon termination, to the extent that the latter claim is
based on the unpaid minimum wages and not the unpaid overtime
wages.  <u>See</u> <u>Pascoe v. Mentor Graphics Corp.</u>, 199 F. Supp. 2d 1034,
1063 (D. Or. 2001) (when the plaintiff not only received a late
payment under O.R.S. 652.140, but also was not paid by his next
regular pay date, the latter failure was a separate violation which

41 - FINDINGS OF FACT & CONCLUSIONS OF LAW

would, by itself, allow for recovery of a penalty for failure to pay minimum wages under O.R.S. 653.055 and thus, there was support for the imposition of penalty wages for violating both O.R.S. 652.140 and O.R.S. 653.055).

In summary, even if plaintiffs succeeded in establishing that the Thingvolds and Pro Kote were joint employers with Classic Painting after May 2005, there are substantial problems with their proof of damages which keep them from recovering any of the unpaid wages they contend are owed. Moreover, even if they established the amount of actual unpaid wages, they are not entitled to all of the penalty wages they seek.

                              CONCLUSION

Plaintiffs fail to establish that the Thingvolds and Pro Kote were joint employers. Judgment is awarded to the Thingovlds and Pro Kote on all of plaintiffs' claims.

IT IS SO ORDERED.

                    Dated this __25th__ day of __March_____, 2010.



                              _/s/ Dennis James Hubel_____
_____ Dennis James Hubel
                              United States Magistrate Judge

42 - FINDINGS OF FACT & CONCLUSIONS OF LAW